(41 South. 436.)

No. 16,064.

STATE v. FREDDY.

(May 7, 1906.   Rehearing Denied June 18, 1906.)

1. INCEST—ESSENTIALS.
      The concurrence of both parties is not essential to incest.
      [Ed. Note.—For cases in point, see vol. 27, Cent. Dig. Incest, § 6.]

2. WITNESSES — CRIMINAL CASES — COMPULSORY ATTENDANCE.
      Where the accused has made the required oath, he is entitled to summon witnesses beyond the statutory six, as matter of right.
      [Ed. Note.—For cases in point, see vol. 50, Cent. Dig. Witnesses, §§ 2–4.]

3. WITNESSES — KNOWLEDGE—PART OF CONVERSATION.
      A witness need not have heard the entire conversation, but may testify to the part he has heard.
      [Ed. Note.—For cases in point, see vol. 50, Cent. Dig. Witnesses, § 85.]
      Land, J., dissenting.

(Syllabus by the Court.)

Appeal from Seventh Judicial District Court, Parish of Richland; William Jefferson Gray, Judge.

J. H. Freddy was convicted of crime, and appeals. Reversed.

Ellis & McGregor, for appellant.   Walter Guion, Atty. Gen., and John R. McIntosh, Dist. Atty. (Lewis Guion, of counsel), for the State.

PROVOSTY, J.   Defendant was convicted of incest, and sentenced to 20 years at hard labor. The accusation is that he had sexual intercourse with his daughter without her consent.

His first reliance is upon the refusal of the court to charge that consent of both parties is essential to incest.

The question thus raised is presented to this court for the first time. It was not considered in the case of State v. De Hart, 109 La. 570, 33 South. 605.

For the definition of our crimes, we are referred by the act of 1805 to the common law of England, as it existed at that date; but incest was not a crime cognizable at common law in 1805 (State v. Smith, 30 La. Ann. 846) ; and hence our statute making it a crime must be interpreted unaided by the light of the common law. It is Act No. 78 of 1884, p. 101, and reads as follows:

"An act to define the crime of incest and provide for the punishment thereof.
"Whoever shall hereafter knowingly intermarry, or cohabit without marriage, being within the degrees of consanguinity within which marriage is prohibited by articles 94 and 95 of the Revised Civil Code of the state of Louisiana, shall be deemed guilty of 'the crime of incest."

The question to be considered is whether the word "cohabit," as used in this statute, implies, or not, the concurrent will of the parties.

Summarized, the argument of the learned counsel for defendant is that whether we read this statute in the light of the definition of the word "cohabit," or in the light of the motives underlying its enactment, or in the light of numerous decisions of the courts of sister states, interpreting similar statutes,

we are bound to understand it as requiring the consent of both parties. That the definition of cohabit, both by the dictionaries and the courts, is "to dwell together as husband and wife," which describes a relation implying the consent of both parties. That the motive of the statute is twofold: To guard against degenerate offspring, and to avoid the scandalous spectacle of persons so nearly related holding themselves out to the world as husband and wife; and that neither of these things is possible unless both parties are consenting. That the following decisions hold that the consent of both parties is an essential element of incest, to wit: People v. Jenness, 5 Mich. 305, 321; De Groat v. People, 39 Mich. 124; People v. Burwell, 106 Mich. 27, 63 N. W. 986; People v. Skutt, 96 Mich. 449, 56 N. W. 11; State v. Ellis, 74 Mo. 385, 41 Am. Rep. 321; State v. Eding, 141 Mo. 283, 42 S. W. 935; State v. Jarvis, 20 Or. 437, 26 Pac. 302, 23 Am. St. Rep. 141; Noble v. State, 22 Ohio, 545; State v. Thomas, 53 Iowa, 214, 4 N. W. 908; Baumer v. State, 49 Ind. 544, 19 Am. Rep. 691; State v. Markins, 95 Ind. 464, 48 Am. Rep. 733; and State v. Fritts, 48 Ark. 66, 2 S. W. 256.

As illustrative of the meaning of the word "cohabit," the learned counsel cite the decision of the Supreme Court of the United States in the case of Cannon v. United States, 116 U. S. 55, 6 Sup. Ct. 278, 29 L. Ed. 561, where, interpreting the statute against polygamy, the court said that:

"The offense of cohabiting with more than one woman is committed by a man who so associates with two women as to hold them out to the world as his wives, and it is not essential to the commission of the crime that he should have had sexual intercourse with either of them."

From this, the learned counsel deduce the conclusion that sexual intercourse is not essential to incest; but that the crime is committed by the parties if, without any act of sexual intercourse, they merely hold themselves out to the world as living together as husband and wife.

We are not impressed by this argument. The etymological meaning of the word "cohabit" is simply "to dwell together." The acquired meaning varies, necessarily, with the connection in which the word is used. In the present statute, we think the meaning is simply that of sexual intercourse, as in our laws upon marriage and legitimacy. The statute and these laws may be said to be kindred legislation; the statute merely, as it were, adding the sanction of punishment to the prohibitions contained in these laws against the union of persons within the prohibited degrees of relationship.

When the statute makes use of the expression "shall intermarry, or cohabit without marriage," it uses the word cohabit in the same sense as do the articles 188 and 189, Rev. Civ. Code, when they speak of the possibility of the husband's "cohabiting" with his wife. These articles do not use the word in the sense of the possibility of the husband's "dwelling with his wife," or of the possibility of his "holding her out to the world as his wife," but simply of the possibility of his having access to her. Tate v. Penne, 17 Mart. (N. S.) 548–555.

Article 111 of the Code provides that a marriage celebrated without the free consent of both parties may be annulled, provided the parties have not "freely and without constraint cohabited together after recovering their liberty."

Commenting on the corresponding article of the Code Napoleon, which, unlike ours, requires that the cohabitation shall have lasted six months, Marcadé says:

"Tacit ratification results, according to terms of article 181, from a cohabitation continued during six months after the recovery of liberty, or after the discovery of the error. It could not be found in any other circumstances whatever. Thus, the pregnancy of the woman, even if occurring after the discovery of the error, or after the recovery of liberty, would be inefficacious. For this pregnancy simply proves that there has been cohabitation; whereas, it is not any kind of cohabitation that the law requires, but one that has continued for six months."

Thus, the great commentator uses the word "cohabitation" in the sense of congress. And our article 111 manifestly uses it in the same sense. No one could doubt that a marriage would be ratified by the voluntary cohabitation of the parties in the sense of sexual intercourse, irrespective of any dwelling together.

So far as concerns the underlying motives of the statute, we need not go elaborately into them. Suffice it that we know that the statute has been dictated by the moral sense of the community, to which the sexual intercourse of persons within the prohibited degrees is abhorrent. Beyond the asertainment of the existence of this moral sense, and that it was it that dictated the statute, we see no use in going. Beyond that point, the question ceases to be one of law, or of the interpretation of statutes, and degenerates into one purely of sociology. The inquiring student, however, who wishes to know why such unions are deemed unnatural, and why they are offensive to the moral sense of modern society, will find the matter fully discussed in connection with the laws that fix the degrees of relationship within which marriage is prohibited. The French commentators are copious on the subject, and Montesquieu, Esprit des Lois, book 26, c. 15, is interesting. The sexual intercourse within the prohibited degrees is just as offensive to the moral sense of the community if accomplished by force or fraud as if accomplished by consent, and, hence, is as much within the spirit of the statute in the one case as in the other.

Coming to the decisions of the courts of other states interpreting statutes on the subject of incest, we note, first of all, that these decisions can be of assistance only in so far as the reasoning by which they are supported is applicable to our statute. In other words, incest not being a common-law crime, these decisions have no common-law authority. As observed by Mr. Wharton, in speaking of incest: "From the reason that, the subject is generally absorbed by statute, no decision of its common-law character is to be cited." Crim. L. (7th Ed.) § 2669a. If we consult these decisions, however, we find them to be fairly divided. See A. & E. E. of Law, vol. 16, p. 135. To the list there given may be added the recent cases of Davis v. People (Ill.) 68 N. E. 540, and People v. Stratton (Cal.) 75 Pac. 166—both well-reasoned decisions, and against the necessity of consent.

The decisions on the affirmative side of the question are all based upon the phrase "with each other," found in the statutes they interpret, from which, it is thought, there arises an implication of the necessity of concurrent consent. Those words are not found in our statute. Though, it must be confessed, an implication of the necessity of concurrence results just as strongly from the single word "cohabit," since the cohabitation cannot but be "with each other." But the aim of the statute is to prevent the unnatural sexual intercourse, and this intercourse exists none the less if accomplished against the will of one of the parties, and the act is none the less incest because it happens also to be rape.

The defendant presented the following motion duly sworn to:

"Defendant in this case now moves the court for a subpœna for Mrs. Tom Johnson residing in this parish. Represents that he has already six witnesses summoned on his part, but now finds that the said Mrs. Johnson is a material and important witness on his behalf, shows that he expects to prove by said Mrs. Johnson that the general character of the prosecuting witness in this case is very bad and corrupt, and that, if the testimony of this witness is submitted to the jury, he believes that they will give very little, if any, weight to the testimony of said prosecuting witness."

The court denied the motion for the following reasons:

"By the Court: The application was refused for the following reasons, to wit: Defendant has already summoned the number of witnesses allowed by law, and for the further reason that in the opinion of the court the ap-

plication and affidavit was insufficient and the evidence inadmissible."

The learned judge does not say wherein this application is insufficient, and for our part we are unable to see why it should have been considered so. It seems to conform with Act No. 67 of 1894, p. 78. What is expected to be proved by the witness is stated, and also why and how the same is material, and the application is sworn to. True, it does not say how far the witness resides from the courthouse, but it does say that she resides in the parish, and Richland is not a very large parish, and the parish seat is in the center; and, moreover, the Attorney General says in his brief that the witness resided only 10 or 12 miles from the courthouse. Distance, therefore, offered no good reason for refusing the application. As a matter of fact, there proved to be abundant time to get the witness. The motion was offered on Monday morning, and the defense did not close its evidence until Tuesday afternoon. The motion did not call for a postponement of the trial.

The impeachment of the prosecuting witness, the main, if not the only, witness against him, was very important to the accused, and evidence as to the general character of the prosecuting witness was certainly not inadmissible. State v. Guy, 106 La. 8, 30 South. 268.

Because the defendant had already summoned six witnesses was good reason for making the application, but surely no reason for refusing it. The statute says that the party "shall not be allowed to summon more than six witnesses, unless" the showing is made. This can only mean that, where the showing is made, the right to the summons follows as a matter of course. In all cases where the application is in due form, perhaps the safer rule for our brethren of the district bench would be to grant it; and to put off the consideration of its timeliness until application comes for postponement or suspension of the trial to await the arrival of the witness or the returns of the sheriff. It can then be known with more certainty whether there was or not time to secure the presence of the witness, and whether therefore the application was timely. We will add that we are not to be understood as saying that the showing in this case was sufficient for a postponement of the trial, but simply for ordering the subpœna to issue.

On this ground the judgment will have to be set aside, and the case remanded.

The next objection is to the ruling permitting a witness to testify to a conversation of which he had heard only a part. The ruling was correct. State v. Allen, 111 La. 154, 35 South. 495; State v. Daniels, 49 La. Ann. 967, 22 South. 415; State v. Vallery, 47 La. Ann. 182, 16 South. 745, 49 Am. St. Rep. 363; Elliott on Evidence, § 241, note 174; A. & E. E. of L. vol. 1, p. 722; 16 Cyc. 1037, note 14.

The next objection is stated differently by counsel and the judge, and this court must accept the statement of the judge. The statement of counsel is that the prosecuting witness and other witnesses for the state having testified that the defendant had always been unreasonably severe with the prosecuting witness, his daughter, the defendant was denied the right to testify to the reason why he had been thus severe. The statement of the judge is that this matter of the severity of the defendant was brought out by the defendant himself on the cross-examination of the state's witnesses, and that it was an irrelevant matter. Under these circumstances, the ruling was correct. The defendant cannot cross-examine the state's witnesses as to irrelevant matters, for the purpose of afterwards contradicting them, or for the purpose of opening the door to testimony on such irrelevant matters. That is a plain proposition.

The misunderstanding between the judge and counsel in regard to the giving of a

written charge is not likely to occur again, and hence need not be gone into.

Judgment is set aside, and case remanded for trial.

LAND, J., dissents from the ruling on point of defendant's legal right to summon the witness during the trial, but otherwise concurs in the opinion.