4   295!
4   325!
4   493
6   125
9*  686
9*  705
11* 543
14* 289
14* 293
21* 464

THE UNITED STATES, RESPONDENT, *v.* LORENZO
SNOW, APPELLANT.

VIDE SNOW *v.* UNITED STATES, 118 U. S., 346.

UNLAWFUL COHABITATION—EVIDENCE.—The evidence stated in the
opinion, considered, and held sufficient to justify a verdict of
guilty of the crime of cohabitation with more than one woman,
created by section 3 of the act of Congress of March 22, 1882, ch.
47, 22 stat. 31.

ID.—PRESUMPTION OF COHABITATION.—A man who has a legal wife
living in the same town, from whom he is undivorced, whom he
recognizes as his wife, and to whose support he contributes, is
conclusively presumed to cohabit with her.

ID.—DISTINCT OFFENSES.—S. was convicted of the crime of cohabit-
ing with more than one woman, under an indictment charging
him with cohabiting with the seven women named therein, from
January 1, 1885, to December 1, 1885, continuously; after this
conviction he was placed on trial in the same court, under an in-
dictment charging him with cohabiting with the same women at
the same place, as in the first indictment, from January 1, 1884,
to December 31, 1884, continuously; in bar of this indictment he
plead his conviction under the indictment for 1885; *held,* that the
two indictments did not charge the same, but distinct offenses,
and that a demurrer to the plea was properly sustained. (1)

APPEAL from a judgment of the district court of the
first district, and from an order refusing a new trial. The
opinion states the facts.

*Messrs. Bennett, Harkness & Kirkpatrick,* and *Mr
F. S. Richards,* for the appellant.

This indictment includes the year 1884. The defend-
ant plead the conviction for 1885 in bar, and a demurrer to
the plea was sustained.

I.

This ruling we assign as error: *Sturgis* v. *Spofford,* 45
N. Y., 446; *Fisher* v. *N. Y. & H. R. R'y,* 46 N. Y.,

(1) Overruled, In re Snow, 120 U. S., 274.

644; four cases like the last, 49 N. Y., 654; *State* v. *Eg-gleston*, 20 Am. Rep., 612; *Mayor of N. Y.* v. *Ordrenan*, 12 Johns., 134; *State* v. *Nutt*, 28 Vt., 598; Citation from 2 Murphy (S. C.), 5 Parker Cr. R., 72.

Where the statute in terms makes a continuing offense divisible, as by providing a penalty for "every neglect," or "each offense," the rule is otherwise, and *People* v. *Central R'y Co.*, 13 N. Y., 78, and *Suydam* v. *Smith*, 52 N. Y., 382, are such cases. The term "cohabit" implies a continuing act or series of acts, the whole amounting to the one thing termed cohabitation, and when a man continuously lives with a woman it is one cohabitation, however long it may continue.

## II.

The law does not presume as a legal conclusion that a man lives with his legal wife, but certain facts being proven, certain presumptions of fact might be made in law. If it is shown that a married man has been living with his wife at a certain place, and that his family are still there, the presumption of fact might be made, in the absence of other proof, that he still lived there. If, however, it should be shown by proof that he had left his family, and was living elsewhere exclusively with another woman, the presumption of fact that he lived with his legal wife would cease, or if the facts were in doubt it would be for the jury to say where he lived. Divorce proceedings, questions arising as to domicile and residence, all show that a husband and wife may live separately, and the absolute or conclusive presumption of law is impossible. In this case the presumption of innocence put the prosecution to the proof that the defendant lived with more than one woman, and the presumption of innocence is stronger than any presumption of fact arising out of matters more remote and not so directly to the issue: Lawson's Presumptive Evidence, p. 433, et seq.

Even if there was a presumption of fact, the jury should not have been told as a matter of law to convict, but should have been told that they might, from the evidence, draw

the conclusion of fact: *Stone* v. *Geyser Q. M. Co.*, 52 Cal., 315; *People* v. *Walden*, 51 Cal., 588.

*Mr. W. H. Dickson*, for the respondent.

BOREMAN, J.:

On the fifth day of December, 1885, three indictments were found by the same grand jury, against the appellant, for the crime of unlawful cohabitation. One was for having committed the offense in 1883, one for having committed it in 1884, and the other in 1885. The alleged cohabitation in each case is with the same women, and the indictments are alike, except as to the time the offense is alleged to have been committed.

Demurrers covering the same points were filed and overruled in all of the cases. The indictment for 1885 was first tried, then the one for 1884, and lastly, the one for 1883. Motions for new trial were made in all, and, being denied, judgments were, on the sixteenth day of January, 1886, entered, sentencing the appellant, in each case respectively, to imprisonment in the penitentiary, and to pay a fine and the costs.

The appellant has brought the cases to this court on appeals from the orders overruling the motions for new trial and from the respective judgments.

The case we are now called upon to consider is the middle one—the one for 1884.

A material ground urged by the appellant for a reversal of the decision of the court below is, that the verdict was contrary to the evidence.

It is now a part of the history of this territory that in cases of this character nearly all of the witnesses upon whom the government has to depend to make out its case are unwilling witnesses. They are generally members of the different households of the defendant, under his influence, and also subject to a powerful church pressure to compel them to shield the accused.

The supreme court of the United States, when speaking of the object of the whole statute—the Edmunds act—in the case of *Cannon* v. *United States*, 116 U. S., 55, says:

"It refers wholly to the relation between man and woman, founded on the existence of actual marriages, or on the holding out of their existence."

Again, in speaking more particularly of section 3 of the act, the court says: "It is the practice of unlawful cohabitation with more than one woman that is aimed at, a cohabitation classed with polygamy and having its *outward semblance*. It is not on the one hand meretricious unmarital intercourse with more than one woman. General legislation as to lewd practices is left to the territorial government. Nor, on the other hand, does the statute pry into the intimacies of the marriage relation. But it seeks not only to punish bigamy and polygamy, when direct proof of *the existence of those relations can be made, but to prevent a man* from flaunting in the face of the world the ostentation and opportunities of a bigamous household, with all the outward appearances of the continuance of the same relations which existed before the act was passed, and without reference to what may occur in the privacy of those relations."

The language quoted, especially the words we have italicized, shows that the highest court of the land—the court of last resort—holds that bigamy or polygamy is the marrying of two or more women, and that cohabitation is the pretending or making show to the outside world of keeping up the polygamous or bigamous relations. The sections of the statute in regard to polygamy and bigamy are aimed directly at the destruction of that relation, and the section in regard to unlawful cohabitation is aimed directly at the destruction of the very pretense—the "outward semblance" of that relation. The purpose of the whole statute is thus to destroy polygamy and the evils attendant thereon, and to confine his marital relations to a man's first and only legal wife. When we have reached the object of the law, we must interpret the words of the statute to effect that object if it can be reasonably done.

The term "cohabitation" in the statute means, in general terms, the dwelling or living together as man and wife. It does not necessarily mean to live in the same house—the word "house" is not used in the definition of it. The

man and the woman may dwell or live together in an open field, or on a railroad train, or in the same house. They are to be conveniently situated as to each other, and to act in regard to each other in such manner as to lead the world to believe that the bigamous relationship exists between them. In these polygamic relations there never is, and cannot be, that intimate association and habitual attention, given by the man to the various women, as exist between a husband and his wife in the monogamic state. Consequently, in the very nature of things, the proof of cohabitation cannot be made as clear as in the case of a monogamic marriage, simply because the facts of which proof is to be made do not as abundantly exist. In the case under consideration we find a state of affairs which, by the facts developed in this class of trials, is coming to be well known to have a common existence in this territory. The wife of a man's youth, and all the other women with whom he has lived as husband, more or less of the time, and who have reared children to him, are as they grow old pushed off to lead a more lonely life, and the principal attention of the man is given to the youngest and most favored of his women. It is the natural result of a system founded in sensualism, and is the same here as in every other country where polygamy or any other system exists to shield the lust of men.

The man who stands at the head of the various households as shown forth in this case, withdrew himself apparently for a large part of his time from his old wife, and took up his chief quarters near his youngest woman, yet he kept his various households all conveniently near him, and took general care and oversight of affairs. He supported these women and supplied their wants. The old homestead of the appellant was occupied by him and his first wife Adeline, and a number of his polygamous women for over thirty years. But in 1882—a year and a half before this indictment is found—he took himself and his youngest woman, Minnie, and made his headquarters in another building close by, on the same block—and to use the language of Sarah, "when the gates were left open it is in the same yard." A large part of the block is sur-

rounded by a high fence, and there is but one other house on the block.

Adeline and Phebe reside in a house two blocks off, a house furnished to them by appellant—not as women, but as wives. Mary lives in another part of the village. Sarah, Harriet, and Eleanor still remain at the old homestead. Appellant keeps up all these various establishments. All of the women (except Mary) lived with him in the old homestead until May, 1882—six women in one house—and after he went out with Minnie, in 1882, the presumption is that all of the others remained in the old homestead—at least there is no evidence of their having moved out—until in 1884 we find from the evidence that Adeline and Phebe were living in another house. Whether they moved there in 1884, or prior to it, does not appear. Adeline appears from the evidence in this case to have been the first wife —there being no evidence that she and another were married to appellant at the same time, thus nullifying the marriage, and as each case has to be settled by the facts as they appear in it, we conclude, so far as this case is concerned, that Adeline is the first and only legal wife of the appellant.

If a man has a wife—a lawful wife—the strong presumption is that he lives and cohabits with her. This presumption is so strong that in some instances he is not permitted to deny access, and we do not know but that such should be the rule in this class of cases. We have, at least, a very strong presumption that appellant cohabited with Adeline. This presumption, no doubt, had an influence, and properly so, with the jury. With this presumption as the starting point, it would require a very slight detail of facts to show that the appellant was cohabiting with Adeline, holding her out to the world as his wife. He furnished her a home, he gave her support, he lived continually in the same house with her, certainly until May, 1882, and probably down into the year 1884, in which he is charged with cohabiting with her, in connection with the other women.

A party was given in 1884 in honor of his seventieth birthday, in the tabernacle of the village, where he and his

polygamous household were located.   One witness says that "many neighbors and friends outside of the Snow family" were there.   From the context we take it that by the "Snow family" is meant various polygamous house-holds of appellant combined, and that all of the "Snow family" were there, including all those women and their children, and especially should it naturally be inferred that above all others Adeline was there.   The same witness says that "Minnie and the whole family" were there.   No other "family" than the Snow family has been spoken of, and no doubt by the "whole family" the witness Harriet included herself and the other women.   The appellant was there and his "whole family" as one family, and some neighbors in addition.' "There were several tables" —"a houseful of people ate"—they were all in one large room, eating and otherwise sociably celebrating his seven-tieth birthday.   Here we see him with all his polygamous households—with all these women—coming together as his wives to celebrate the birthday of him who claimed them all as his wives.   If any of them had been absent, the wit-nesses would not have said that the "whole family"—and many "beside the Snow family"—were there.   We think there is no other conclusion.   Add to this treating of these women as wives, the fact that Adeline and the other women went by his name—she and each of the others were known as "Mrs. Snow"—that he recognized her and the others as wives—supported them "as wives"—that they were all recognized in the family and out of it and in the whole community as his wives—and we think the jury were fully justified in concluding that he lived and co-habited with Adeline, his first wife.

Sarah says in her testimony that she herself was mar-ried to appellant many years ago, and has never been di-vorced; that appellant supported her in 1884; that she lived at the old homestead, and had lived there over thirty years; that appellant provided for all her wants; that he might have called on her; that he called, perhaps, two or three times to see his and her sick daughter and brought medicine.   She does not admit and she does not deny that he visited her house, but says that she did not live

with him as his wife; that he did not eat or sleep there in 1884; that she kept no room for him, and he did not occupy a room there.

Another witness—Dr. Carrington—says that in 1884 he saw appellant with Sarah in Little Valley, at the house where he was attending their daughter, who was injured by an accident. He also saw appellant at Sarah's home, the old homestead, in town—in Brigham City—that the appellant was the one who paid him for his services in attending the sick daughter; that these women were all known in Brigham City in 1884 as appellant's wives; that the first time he saw appellant at Sarah's house, the appellant left before he did, but the next time he went away leaving the appellant there. Dr. Carrington also says that he saw appellant and Sarah out riding in the same conveyance in August, 1884, going with their little daughter from Little Valley. The appellant must have remained in Little Valley with Sarah, looking after their sick daughter, two or three days; for appellant was at the house in the valley when the doctor went there; the child was kept there two or three days, and then appellant is seen with Sarah taking the child away. Sarah, no doubt, was in 1884 at the birthday party spoken of, as also the other women.

Taking these facts in connection with the facts of recognition by him and all the family and the community, of Sarah as well as the others as his wives, would seem sufficient to justify the jury in concluding that during 1884 the appellant cohabited with Sarah. It was not necessary that she or any other of these women should "keep a room" for him. He was not far away from any of them. He was in the same village, and none of them more than two blocks from him. It was possible for him to withdraw himself from his first wife, and from the old homestead, and take up his headquarters in the centre of a block, and do his eating and sleeping there, and from such headquarters give out his general orders, and essay whenever he chose to do so to visit amongst his various households, and the world would have no knowledge of his doings. All the opportunities of the marital relations with these women

would be open to him, and the whole community are his friends, and approve the polygamic system, and have no wish to look too closely into the precise course of conduct he is or might be pursuing toward or with his numerous wives and their households. We say the whole community, from the fact that all of these Mormon villages are thus friendly to the polygamists and to the system itself. This is a well-known fact, too notorious to be denied. Would not a man so living be cohabiting with all the women he was thus maintaining and supporting, and holding out as wives? We think the conclusion is inevitable that he would. He could be the head of each and all of these diverse establishments, and they would be all one "Snow family."

But there were other women besides Adeline and Sarah to be visited and looked after. As these two were old and stricken in years, and had lost their charms for him measurably, he betakes himself to his newest and last woman whom he had gathered to his fold. Minnie was the last one to whom he was married. She testified that in 1884 appellant made his home with her, that he ate there, and slept there, and that she had three children by him, the youngest being but three months old when the trial took place; that he supported her; that his office was at her house, and his mail was received there, and that he transacted most of his business there. But all of his time and attention could not be given to Minnie, and Sarah, and Adeline; there were others, and among them Harriet, whom he had married nearly forty years ago at Nauvoo, and she and appellant had never been divorced. She could not tell positively that he visited her in 1884 (this confining of the testimony to the year 1884 seems to have thrown the memories of some of the witnesses clear out of reckoning—they could not separate 1884 from the other years, and confine themselves to it). She says that appellant might have come in during 1884; she could not be positive as to that; they met as friends, and he called as a friend. She resides at the old homestead; she was at his birthday party before spoken of.

Lucius Snow, a son of the appellant and Harriet, saw

him in 1884, with Harriet, at the farm, two miles out of town; appellant brought her out there, and took her away.

The evidence is that he supported her, recognized her as wife, and she was so recognized by the family, and community, and by him.

Eleanor was another of these women to whom he had been married, whom he recognized and supported as such. She resides at the old homestead—has lived there thirty-five years; that he might have called on her socially in 1884—the witnesses generally seem to think he might have called on them. The presumption is that he did call—generally on them—as part and parcel of his general superintending care over them. But Harriet says he did not dine or sleep at her house in 1884; that if he did call, it was to see the children. She was known by all as one of his wives.

Mary was another of his polygamic women. She was married to him thirty years ago—that she used to live at the old homestead, but removed from there eight years ago and now lives by herself, with her children, and has so lived since she moved from the old homestead. Appellant provides for all her wants; he did not eat or sleep in her house in 1884, but he called as any other gentleman friend and nothing more. All of these women were recognized by him and the public as his wives. He seems to probably have called a goodly number of times on these different women in 1884. We have the right to infer that he was looking after the interests of these various households as any man looks after his household. We are not told what he said on these visits, but the natural conclusion is that the talks had regard to family matters, which he was looking after, and that, no doubt, caused his visits. Besides, his calling may not have been as frequent as in other years, simply because he was out of town a large part of the year, and had too many women to allow any great attention to any except a favorite.

The jury, in ascertaining whether the appellant was guilty or not, had the right to take into consideration his concealment at the time of arrest, and also the manner of concealment.

From all the facts shown, we do not think the verdict could have been otherwise, and we do not think it is contrary to the evidence.

The evidence that he cohabited with Adeline, Sarah, and Minnie, is stronger than the evidence as to the other women; yet there is evidence also in regard to these others. If the case be deemed one of conflict of evidence, we are not authorized to reverse on the ground of insufficiency of the evidence: *People* v. *Forsythe*, 65 Cal., 101; 2 West Coast Rep., 288.

In reaching the conclusion we have, in regard to the sufficiency of evidence, we have endeavored to carry out what we believe, and what the United States Supreme Court say, is the object of the Edmunds act. If polygamy be the marrying of more women than one, and unlawful cohabitation is the outward semblance—the pretending to be in polygamy—the holding out of more than one woman as wife, and flaunting all the opportunities of a polygamous household in the face of the world, then this case is clearly made out; but it is otherwise if a living, staying, dwelling, eating, sleeping and lodging, in each house must be shown by direct proof, and the law fails in its object, and it will be a vain and a fruitless effort to destroy the outward semblance of polygamy—the ostentatious display of the polygamic relation—without additional legislation. The shrewd and cunning polygamist can easily evade the law as it stands without an interpretation.

It is further urged that the court erred in its charge to the jury, in giving the following instruction, viz.: "If you find beyond a reasonable doubt that the defendant had, during the year 1884, a legal wife living in Brigham City, Box Elder County, Utah Territory, from whom he was undivorced, that he recognized her as his wife, held her out as such, and contributed to her support as such wife, and that during the same year he lived in the same house with the woman Minnie, recognizing her as his wife, associated with her as such, and supported, and held her out as a wife, then the offense of unlawful cohabitation is complete, and you will find the defendant guilty. The legal wife in this case is the one whom the defendant first married."

It is claimed that this instruction took the case from the jury—that it told the jury to convict without any proof of the "living together." It is said that if there was a presumption of fact, the jury should have been told that they might, from the evidence, draw the conclusion of fact, but that the jury should not have been told, as a matter of law, to convict. We are referred to two cases to support this position. The case of *People* v. *Walden*, 51 Cal., 588; cited by the appellant, was an election case, and the defendant was charged with having changed the ballots. He had a key said to fit the lock of the place where the ballots had been deposited. The court charged the jury that the possession of the key unexplained, raised a reasonable presumption that defendant had the key for the purpose of using it to open that lock. It was the court and not the jury presuming one fact from another, and the court said it was charging the jury "with respect to matter of fact," in contravention of the state constitution, and was held wrong. The court below in that case invaded the province of the jury—telling them that if they found one fact they were to presume another necessary fact to exist. Nothing of the kind appears in the case at bar. Here the court tells the jury that if they find certain facts to exist, those facts are enough to make the proof of the offense complete, and they should convict.

The case of *State* v. *Geyser Q. Mining Co.*, 52 Cal., 315; was in regard to abandonment of a mining claim; and the court told the jury that if they found certain facts they were authorized to find a certain other fact—the fact of abandonment. The question of abandonment was one of the facts—the ultimate facts that had to be found by the jury—upon which to base their verdict. It was probably improper for a court to tell the jury to presume from one of these facts that another exists. But that would be very different from telling the jury that certain facts when found made complete the proof of the crime charged. One of the facts necessary to make out the offense was not authorized to be drawn from the existence of another fact which had been proved, but all together make out the crime charged.

The form of the instruction is not unusual: *State* v. *Levigne,* 17 Nev., 435; *Miles* v. *State,* 14 Tex. App., 436.

The material point about such an instruction is whether the facts detailed by the court would make the offense complete. In the first language we quoted from the supreme court of the United States, in *Cannon* v. *United States,* the idea is conveyed that the "holding out" of marriage was the gist of the offense. With the opinion in that case before it, the lower court would very naturally follow in the same line of reasoning by giving the instruction now objected to. The holding out of these women is shown by the appellant having married them all, and not dissolved such relation, that he supports them as his wives, not as women only, that he associates with them: and he declares them to be his wives—that he visits them, looks after each, takes them out riding, stops with them in the country, takes oversight of each family, and keeps them in houses easy of access, and where his visits would attract no attention, allowing them to be known as his wives, and to go by his name in the community, together with the strong presumption in favor of the first wife. This instruction is based upon such facts—and like every other instruction in any case it is intended to suit the facts proven. The instruction, therefore, was not erroneous when it told the jury, in effect, that the proof as to Adeline was sufficient, if they found that she was the first wife, and had never been divorced from him—that he recognized her as his wife, held her out as such, and contributed to her support as such wife.

The appellant assigns also, as error the sustaining of the demurrer to his plea of former conviction. This is probably the most important point in the case, and as applied to an indictment of this character, one upon which there is not an abundance of authority either for or against it.

This indictment is for the year 1884. In addition to the plea of not guilty, the appellant entered a plea of former conviction in the case covering the year 1885, in bar of this action. To this plea of former conviction, the government demurred and the demurrer was sustained. In assigning this action of the court as error, the appellant

cited several authorities. The case of *Sturgis* v. *Spof-fard*, 45 N. Y., 446, cited by him, was an action to recover certain penalties for a violation of the following statute of the state of New York, viz.: "All persons employing a person to act as pilot, not holding a license under this act or under the laws of the state of New Jersey, shall forfeit and pay to the board of commissioners of pilots the sum of one hundred dollars." By this statute the offense consists in the employment, and not ·in the piloting of ships or other vessels.

The case of *Fisher* v. *N. Y. & H. R. R'y*, 46 N. Y., 644, is somewhat more similar to the case at bar. A statute of New York provided that any railroad company which should ask and receive a greater rate of fare than that allowed by law, should forfeit fifty dollars, which sum might be recovered, together with the excess so received by the party paying the same.

The plaintiff in that action had taken passage for a very short distance on the road of the defendant company, and repeated his passage twenty-six times, and paid thirty-four cents for each of the passages. These thirty-four cents were in excess of what the law allowed. The plaintiff made such passages solely with the view of getting the penalty. The plaintiff did not bring a separate suit for each passage, but waited until he had made twenty-six and then in one action sued for the penalty on each of the passages. The court said that the fifty dollars was not intended as a satisfaction for the injury, but to enable the party defrauded to prosecute his case in court and to pay the expense of suit; that a construction permitting the penalties for a number of infractions of the law to be united and all the penalties to be recovered, would not be favored—that it would defeat the object of the law, which was to suppress the extortion by prompt prosecutions. Besides, the plaintiff in that case frankly admitted that he had abandoned other business and made those short trips in order to get the penalties. By uniting them in one suit, he could avoid the expense of more than one suit. The court said that the penalty was intended to be sufficient to cover the expense of one suit,

and not to be a profit to the party, and as he had made but one suit he was entitled to but one penalty.

The case of the *State* v. *Commissioners*, 2 Murphy, 371, cited in 5 Parker's Cr. R. 72, was a case where the commissioners were required to keep the streets in order. It was sought to indict them for each of a variety of streets which were out of repair; but the court said: "The defendants are bound to keep all the streets in repair, and are liable for indictment for every neglect of their duty, but if more than one street is out of repair at the same time this does not multiply the offense." That case might be analogous to the present one at bar, if these cases against the appellant were all for the same year, but for different infractions of the law at the same time.

The case of the *Mayor, etc.* v. *Ordrenan*, 12 Johns, 122, was an action of debt to recover penalties aggregating three thousand dollars, under a special statute in regard to keeping gunpowder in the city of New York, and authorizing its regulation, and "to impose penalties for the non-observance of the same, not exceeding two hundred and fifty .dollars." The city, in pursuance of this statute, passed an ordinance which, amongst other things, required a forfeiture of one hundred and twenty-five dollars for every one hundred pounds of powder kept in violation of the ordinance. The defendant in that case was charged with having kept twenty-four hundred pounds in the city, in violation of the ordinance, and judgment was asked against him for three thousand dollars. But the court said: "The act, in authorizing the imposition of penalties for non-observance of by-laws to be passed, and in restraining the penalty to two hundred and fifty dollars, clearly manifested an intention on the part of the law-makers that no more than that sum should be exacted as a penalty for any one offense, or for the violation of the by-laws in any transaction. Should a different construction prevail, the limitation in the amount of the penalty would be nugatory, and penalty to the amount of two hundred and fifty dollars might be repeated, not upon the offense itself, but upon the quantity of the offense." There was but one offense, and the

amount of the powder could not make it otherwise. The city was not authorized to impose a penalty for any particular amount, but simply for each offense, whether the amount kept was one pound or a thousand pounds beyond the limit. We do not see that the case bears upon the question before us in the present case.

The case of *State* v. *Nutt*, 28 Vt., 598, was one where the defendant had been convicted of being a common seller of intoxicating liquors without license, and was afterwards indicted for making a single sale during the time covered by the indictment in the first case. The court said that "the several sales are constituted parts of one offense; and one, too, of a different character, when measured by the penalty, from that of a single act of sale." The defendant should not be convicted twice for making the same sale—but had not his plea been upheld he would have been. There is no similarity between that case and the one we are now considering.

In the case of *State* v. *Eggleshot*, 41 Iowa, 574, reported in 20 Am. Rep. 612, and also cited by the appellant, was a case where the defendant delivered at the same time and by the same act to the teller of a bank four forged checks, purporting to have been drawn by different persons. The court held the uttering of the four checks was one act and constituted but one offense, and that as a consequence a conviction for uttering one of the checks was a bar to a conviction for uttering the others. If the indictments against the appellant were for the same year but for different infractions of the statute, this case would be in point. But as the indictments stand, they are for different years, and the offense for one year could not be classed as the offense of another year.

In the case of the *Commonwealth* v. *Robinson*, 126 Mass., 259, the complaint charged the defendant with keeping a tenement used for the illegal sale, and illegal keeping for sale, of intoxicating liquors on January 1, 1878, and on divers other days and times between that day and August 20, 1878. The defendant pleaded an acquittal on a complaint charging the defendant with keeping and maintaining a tenement for the illegal sale, and

illegal keeping for sale, of intoxicating liquors on January 1, 1878, and down to May 1, 1878, and that the tenement alleged in the first complaint was the same as was alleged in the second. Both complaints include the time from January 1st to May 1st of the same year. The court held the plea of former acquittal, if established, to be a bar to the second prosecution, for the reason that the same evidence would be required to convict in both cases. The court said that the principles which govern it are, however, quite well settled, that the question is fully discussed in *Morey* v. *Commonwealth,* 108 Id. 438, where the chief justice of that court reviewed the whole subject, referred to the leading decisions bearing upon the question, and said: "A conviction or acquittal upon an indictment is no bar to a subsequent conviction and sentence upon another, unless the evidence required to support a conviction upon one of them would have been sufficient to warrant a conviction upon the other."

In the case of *Commonwealth* v. *Conners,* 116 Mass., 35, the court held that a conviction under the general statute of the state (c. 87, sec. 7), for maintaining a certain tenement on a day certain, and divers other days between that day and a day certain, for the illegal keeping and sale of intoxicating liquors, was not a bar to an indictment found at the same session of the grand jury for maintaining the same tenement for the same purpose on the last day named in the first indictment, and on divers other days between that day and another day certain. This last case appears to be directly in point, and we are of the opinion that it supports the ruling of the lower court in the present case on the point under discussion. It is the only case we have seen which squarely meets the issue, and it sustains the ruling of the court below in the case at bar. Coming as it does from the very able and highest court in one of the oldest commonwealths of our Union, it commands respect and consideration, and we have no hesitancy in following it. We, therefore, find that the court below, in the present case under consideration, committed no error in sustaining the demurrer to the plea of former conviction, interposed by the appellant.

Upon the whole case, therefore, we do not think that the court below committed error. The decision of the court is affirmed.

POWERS, J., concurred.

ZANE, C. J., dissenting.

I dissent from the judgment of the court. The evidence showed that Adeline (a woman named in the indictment) was defendant's lawful wife, without showing that during the time mentioned therein he was ever in her company, or ever spoke to her or she to him. The court charged, in substance, if the jury believed that the defendant, during the time mentioned in the indictment, had a lawful wife living whom he recognized and held out as his wife and contributed to the support of, and that during the same time he lived and associated with, and recognized and supported another of the women named as his wife, the offense of cohabitation was complete, and that the jury should convict. I think it essential to cohabitation with defendant's lawful wife that he should have been in her company some part of the time mentioned in the indictment. Association together to some extent is an element of the crime of cohabitation as defined in the Edmunds law. It is not sufficient that a man and his lawful wife should live in the same neighborhood or the same city. Nor do I think that cohabitation is conclusively presumed with the lawful wife from the facts mentioned. There was other evidence tending to show that defendant did not cohabit with his lawful wife. The jury should have been left at liberty to find the fact of cohabitation with the lawful wife from the facts mentioned considered with all the other evidence bearing upon it.

I concur with so much of the opinion of the court as holds that more than one indictment for unlawful cohabitation may be found by the same grand jury for different periods against the same defendant.