**Margaret M. McCarthy, Plaintiff in Error, v. William J. McCarthy, Defendant in Error.**

**Gen. No. 25,407.**

1. APPEAL AND ERROR, § 1395*—*when findings of chancellor are conclusive.* It is the rule that the finding and decree of a chancellor in a separate maintenance suit, where he had the opportunity of seeing the witnesses and hearing them testify, should not be disturbed on appeal, except where the evidence clearly preponderates against such finding and decree.

2. APPEAL AND ERROR, § 1395*—*when findings of chancellor will be reversed.* Evidence reviewed in a separate maintenance proceeding and decree dismissing the bill for want of equity reversed.

3. HUSBAND AND WIFE, § 216*—*when wife is entitled to separate maintenance.* A complainant may be entitled to separate maintenance notwithstanding she may not have been wholly blameless or as patient under provocation as some women would have been, and where her conduct was not such as would have entitled her husband to a divorce, and she did not voluntarily consent to the separation nor desert her husband.

4. HUSBAND AND WIFE, § 218*—*when wife is not required to return.* After a separation between husband and wife, the latter is not bound to return, where, although the husband stated that he was willing to have her return, he made no promise of future kindness or better treatment.

Error to the Superior Court of Cook county; the Hon. CHARLES M. FOELL, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1919. Reversed and remanded with directions. Opinion filed October 13, 1920.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

**Statement by the Court.** Complainant seeks by this writ of error to reverse a decree entered by said superior court on January 6, 1919, dismissing for want of equity her amended bill for separate maintenance.

The original bill was filed November 15, 1917. Defendant filed an answer thereto as well as to the bill as amended. Complainant alleged, in substance, that the parties were married on September 5, 1900, and lived together until July 12, 1917, when she was compelled to and did leave him; that two children, Dennis and Gertrude, aged 13 and 8 years, respectively, are living; that since September, 1911, defendant failed to perform his marital duties, and that by his attentions given to divers women his affection for complainant was alienated; that from September, 1912 until May 28, 1916, he absented himself from his home on two regular nights of each week, under the pretense of necessary business affairs, but that in fact he spent much of said time and other times at divers places in company with various women, particularly with one "Miss X" (in the amended bill the true name is given); that he frequently reproached complainant for attempting to obtain any information regarding his business, his said absences and practices; that on May 25, November 12, November 17, 1916, and July 12, 1917, he angrily commanded complainant to leave their home; that his attitude towards complainant during the period from September, 1912 to July 12, 1917, was hostile and his conduct wholly unbecoming a father and husband, resulting in making her life miserable and unhappy; that he has been guilty of extreme and repeated cruelty; that on February 19, 1917, he threatened her life, flourished a revolver and stated "its either you or I"; that on July 12, 1917, he flourished his clenched fists in her face, roughly pushed her, and again threatened her life, stating that he would "break her back" unless she would immediately leave the home, and that she did then leave, taking with her the

children, and that she has been living separate and apart from defendant ever since; that from March, 1917 up to July 12, 1917, she was in fear of bodily harm from defendant, and that because of his said attitude, conduct and threats he is an unfit person with whom to live as husband and father; that complainant receives no income from any source and is unable to support herself and the children; and that defendant is abundantly able to support them, is employed by and is secretary of a large business corporation in Chicago, has considerable means and a large annual income.

Defendant, in his amended answer, admitted the separation on July 12, 1917, and his ability to provide for the proper support of complainant and the children in the family home, and alleged that she left him without any reasonable cause, taking the children with her, and has since refused to return. He denied substantially all the other material allegations of the bill. He further alleged that after July 12, 1917, and prior to August 12, 1917, complainant, without right and without his knowledge, removed from said home many household articles belonging to him, and that on August 12 she came to the home and used violent language towards defendant in the presence of servants, and attempted to break down certain doors and demeaned herself in an unbecoming manner; that during their married life his conduct towards her had been forbearing, and that the quarrels which arose were in part the result of "unbearable nagging" practiced by her, and in part the result of his protests against her extravagant expenditures for wearing apparel and entertainment; that since July 12, 1917, defendant has maintained the family home, at 3521 W. Jackson Boulevard, Chicago, which at all times has been and is now open for complainant and said children and is one suitable for their station in life; that the cause of her leaving him and the home, and her acts and conduct towards him, is not the result of his alleged misconduct, but

is the result of an "inordinate desire" on her part "to procure from this defendant money to spend upon herself for personal adornment and entertainment," that she has repeatedly demanded "that he allow her for her own personal use sums in excess of the actual income of this defendant," and that her desire "to spend money and to be constantly entertained in an extravagant manner has grown upon the complainant from year to year, until such desire now amounts almost to a mania."

There was a protracted hearing in open court before the chancellor at which many witnesses testified and certain documentary evidence was introduced. Voluminous printed arguments have been filed and the case has been orally argued by respective counsel. From the abstract of record of 289 pages and from portions of the record, assisted by said arguments, we glean the following:

The parties were married on September 5, 1900. They ceased having sexual relations, according to her testimony, in 1912; according to his, in the spring of 1916. They quarreled frequently during 1916, and on several of those occasions he, according to her testimony, corroborated by that of a domestic servant, angrily ordered her to leave the home, but she did not. He denies giving such orders. For several years prior to 1916 it appears that he was away from home, rather regularly, on certain nights. Early in 1916, or prior thereto, gossip came to her that he was improperly attentive to other women, and particularly to a stenographer in the office of the corporation where defendant worked, the "Miss X" referred to in the bill. Subsequently, she found in his possession a vest-pocket note book, in which , as she claims, were written down in his handwriting the names, addresses and telephone numbers of various women, among which the name, etc., of a woman named Anderson, living in the second flat of an apartment building at 4042 Clarendon av-

McCarthy v. McCarthy, 219 Ill. App. 369.

enue, Chicago.   She made a copy of these entries. (Upon the trial, the original note book not being produced after notice, the copy was allowed in evidence.) She became suspicious that her husband was unfaithful to her.   She acquainted him with her suspicions and on many occasions asked for explanations.   But he did not make at any time any explanation which seemed satisfactory to her, and, according to her testimony, frequently refused to discuss the subject, saying that it was "none of your business," and on these occasions both became angry.   Father Quigley, defendant's witness and pastor of a Catholic church and who had known both parties for over 20 years, testified, in substance, that some time in the fall of 1916, complainant called and sought his advice concerning "the wrongs she believed her husband was doing," and detailed to him her suspicions and her reasons therefor; and that he said that she might be mistaken in her suspicions, but that he advised her "to employ detectives to watch him for a short while."   Complainant testified that during that fall she began making investigations; that she hired a detective who made trips of investigation as to certain names, addresses and telephone numbers found in said note book; and that she did some detective work herself.   Defendant testified that he said to her, as to her charges concerning his improper relations with "Miss X," that "no explanation was coming to her,   *   *   *   that he had no explanation to make," and as to entries in the note book, "I did not attempt to satisfy her;   *   *   *   I did not think I owed any explanation to her; she was doing the investigating herself."   Ernest Stave, janitor of the apartment building at 4042 Clarendon avenue, identified defendant on the trial as being a man whom he had several times seen "around the building" during the summer of 1916.   William Jensen, of the real estate firm of Regelin & Jensen, testified that in the spring of 1916, he had charge of the renting of the flats in

said building and that one Harry Willard signed a lease for the second flat for a period of several months. On the trial the witness identified defendant as the man who had called at his office two or three times during the spring or summer of 1916, and had personally paid to the witness the rent for said second flat for the months of May and June, and on one occasion the call related to some repairs desired to be made in said flat. George A. Cudmore, sergeant of police, testified, in substance, that an anonymous letter had been received making complaint that the occupants of said second flat were "questionable"; that some time during the month of June, 1916, about 10 o'clock a. m., he called there for the purpose of making an investigation, and found two men and two women; that one of the men was "that man sitting there" (indicating defendant), who then said that his home and business was in Detroit but that he often came to said flat; that the witness also conversed with one of the women, told her of the complaint received and suggested that she had better move out and that she said she would do so. Defendant testified that he never was in said flat, never was in the office of Regelin & Jensen and never saw Sergeant Cudmore until he testified in court. And defendant called as witnesses Mrs. Eva McEniry and Harry M. Ziv. The former testified, in substance, that she moved into said flat in April, 1916; that the lease was signed by Harry Willard for her; that when she moved in she went by the name of Eva Anderson; that she stayed there until some time in August, 1916; that Harry Willard and a Mr. and Mrs. Balmer lived with her there, and that she was the head of the household; that she remembers Sergeant Cudmore calling at the flat in June, 1916, telling her of complaints and saying that he would give her two weeks to get out; that defendant was not there at the time of Cudmore's call and that she had never met defendant until the day she testified; that the reason she appeared as a witness was

that she had seen in a newspaper an item concerning the trial and that defendant's name had been mentioned in connection with her said flat; and that her curiosity was aroused and that she at once telephoned defendant's solicitor to explain matters. Harry M. Ziv, engaged in the furniture business on the west side of Chicago, testified, in substance, that he sometimes used the name of Harry Willard; that he signed the lease for said second flat in April, 1916; that he had known Eva Anderson for about 4 years; that although he had a room at the home of his parents on Prairie avenue, he also in the spring of 1916 had an address at 4042 Clarendon avenue; that he was in said flat when a police officer called; that defendant was not there at the time; and that he never met defendant until the day before he (Ziv) testified, when he met him in the office of defendant's solicitor. The defendant also called as a witness the "Miss X" mentioned in the bill. She denied ever having had any improper relations with defendant.

As to the happenings on February 19, 1917, complainant testified, in substance, that on that morning the defendant came into her bedroom and over to the bed where she was lying, held a revolver over her head and said "It is either you or I"; that she called their son, Dennis, into the room; that afterwards defendant rushed at her again, still holding the revolver in his hand, and said: "You may have the goods on me, but I will show you I will get it on you"; that shortly thereafter she telephoned to Father Quigley to come to the house and that later he arrived and a long interview took place, during which both she and defendant became much excited and he again flourished the revolver, and she became frightened. In these statements she is corroborated by the testimony of their son, Dennis McCarthy, 14 years of age. On the trial the defendant admitted that during said interview he held a revolver in his hands, but "not necessarily

placed it at her head." Defendant further testified, in substance, that upon his return home from mass that morning he found three slips of paper, one lying on a table in the back parlor and the others in other parts of the house, on which were written in his wife's handwriting, as he claims, certain memoranda regarding his alleged "indiscretions and immorality"; that said slips of paper "rather roiled" him; that he picked up a small, unloaded revolver, and went into his wife's bedroom; that he told her that he had picked up "these notes," that he was tired of this "carrying on," and said: "This has got to stop, you either take this or I will take it"; that when he made this statement "he did not point the gun at her"; that "he would not say that Mrs. McCarthy was frightened at that time"; and that although he had made a search for said slips of paper he had been unable to find them. The complainant denied writing and placing said slips of paper. Father Quigley, defendant's witness, testified, in substance, that in response to a telephone call he arrived at the parties' home about 8:15 o'clock a. m.; that during the stormy interview which followed complainant repeatedly charged defendant with having had immoral relations with other women; that defendant said he had never been unfaithful to her and "had nothing to change or make right"; that both became very excited; that finally defendant "walked right up in front of Mrs. McCarthy * * * and held in his hand * * * a revolver"; that the witness "could only see a little part of the tip of the barrel," and defendant's "hand was straight in front of her, the revolver being held in his hand, and he said: 'This terrible worry must end; it is either you or I'"; that complainant "didn't move" and the witness "could not tell whether she was really frightened or not"; that during this "revolver incident" the witness "did not arise" from his seat; that after further conversation defendant went upstairs and the witness asked complainant to make some proposi-

tion so that the "affair" might be closed and "peace" made; that complainant replied that she had no proposition to make and that defendant "must make the proposition towards a settlement."

Complainant further testified, in substance, that after said happenings she was much upset and did not know what was best to do; that on the same day she consulted an attorney named O'Donnell; that he suggested a conference with defendant in his (O'Donnell's) office; that a conference was had there on March 10, 1917, at which O'Donnell, Father Siedenburg, a priest, defendant and herself were present; that she again asked defendant to explain the entries made in said note book but that he again refused; that O'Donnell then said that the "moral questions" should not then be discussed, but rather household affairs and financial matters; that complainant then said that the moral questions were "of greater importance to me than money matters," and that she did not want to return home without a definite promise from defendant that he would change his way of living, and that without it "our affairs were not going to improve"; that O'Donnell thereupon said that "we both should go back home and try and fix this thing up on account of the children"; and that both she and defendant thereupon agreed to do so and both went home that evening. Father McNamee, another Catholic priest and called as a witness by complainant testified, in substance, that several months prior to July 12, 1917, the day the parties finally separated, defendant called and urged his assistance in bringing about a reconciliation with his wife; that defendant said that he was much worried, that she was a "good woman with an unblemished character," but "money mad," and had been "ill-advised"; that the witness said he would do what he could to assist; that on June 21, 1917; the witness, defendant, and Father Siedenburg had a conference at which defendant made certain statements regarding

the financial arrangements he would be willing to make if she would become reconciled to him; that defendant said, in substance, that he would continue to support her and maintain the home with some exceptions, that he would not keep up the expense of the automobile but she could use taxicabs, that he would put enough money in the bank to meet her reasonable expenses, that he would give her $50 a month as "pin money," that he would like her to take the children and go on a vacation of a few months and then he would go after them and bring them home; that afterwards on the same evening the witness and Father Siedenburg, at defendant's request, had an interview with complainant; that during said interview they urged a reconciliation and defendant's said proposition was repeated to her; that she said that it was not a question of money and that defendant had failed to keep his promises in the past; and that while complainant did not refuse to accept defendant's proposition no definite decision was reached, but it was arranged that a further conference should be had.

This further conference, lasting several hours, was had on the evening of July 12, 1917, at the family home on the second floor. Complainant, defendant and Fathers Siedenburg and McNamee were present and further discussion was had as to money matters and settling the family situation. Complainant testified, in substance, that towards the end of the conference she again asked defendant for explanations as to his past conduct, which he again refused to make; that Father McNamee said that she was entitled to have them; that thereupon defendant became angry, rushed up to her and shook his fist in her face and violently shoved her against the mantelpiece, and said to one of the priests: "You better take her with you, because if you leave her here I will break her back before morning"; that defendant rushed out of the room and as he was

McCarthy v. McCarthy, 219 Ill. App. 369.

going down stairs said: "I will kill her"; and that shortly thereafter and late at night she left the home, in company with her son, Dennis, and Father Mc-Namee, and went to her mother's home and has not since lived with defendant. As to these happenings she is corroborated by Father McNamee, who in addition testified that during the early part of the conference defendant seemed anxious to get away and repeatedly asked complainant to let him out of the room, during which times she was either sitting or standing with her back against the door and appeared desirous that he should not leave; that just prior to the time defendant made his threat to "break her back" complainant had made some remark concerning defendant's parents which greatly angered him, that he took hold of her by the shoulders and shook her, but did not strike her; that Mrs. McCarthy seemed frightened and cried out; that the witness "had great fear" that she would be injured; and that after defendant had left the room, complainant appeared afraid to stay in the house that night and said she was going to the home of her mother and shortly thereafter went there. As to defendant making both of said threats complainant is also corroborated by the testimony of the son, Dennis. Father Siedenburg did not testify. While defendant admitted that he "flashed his clenched fist" in complainant's face, he denied striking or touching her or saying that he would kill her. He also admitted making the threat to "break her back," but stated that he was "excited and nervous" at the time, and that the remark was called forth by complainant making uncomplimentary remarks about his parents, and that he did not "intend it."

Complainant further testified, on examination by defendant's solicitor, that following said happenings she several times went to the family home, in defendant's absence, and got some, but not all, of her clothes and other personal property belonging to her; that upon a

subsequent call she found that the locks on certain doors had been so changed that she could not enter the house or into the bedroom she had formerly occupied, and other rooms, for the purpose of getting her remaining personal effects; that on August 12, 1917, in company with her son, Dennis, she again went to the home, found the doors on the first floor open, walked inside and telephoned a locksmith to come over immediately for the purpose of having keys made for the new locks; that to her surprise defendant appeared and asked her for what purpose she was there and she told him; that in the meantime the locksmith came and defendant ordered him away; that she asked defendant for some of her clothing, which request he refused to grant, and later she went upstairs and found the door to her bedroom locked; that she tried to break the door down and get into her bedroom, but was unable to; that she left some marks on the panel of the door; that she was angry and talked loud but cannot remember all that she said; that some of the windows were open, and that it is probable some of the neighbors heard some of her uncomplimentary remarks regarding defendant. The latter, on cross-examination, testified, in substance, that after the separation on July 12, 1917, complainant and her sister had been "snooping around" the home two or three times; that complainant was in the house several times and took a lot of furniture away; that she had never asked him personally for permission to get her belongings or wearing apparel; that after she had come to the house and taken some of the household effects away he gave instructions "not to let any body in"; and that he "changed the locks on the doors to make certain no one would enter the house." Defendant also called as witnesses his cook and houseman at the time, and both testified that while complainant was endeavoring to break down the door leading into her bedroom, with a "meat pounder," she called defendant vile names and struck him once upon the

arm with said instrument, but that defendant did not strike her.

Defendant further testified that after July 12, 1917, he did not "personally say or do any one act or thing to induce" complainant to return to him, with possibly one exception when, in company with his attorney, he called at the office of her attorney and there was talk about a possible financial settlement; that at this conference defendant asked her attorney "if this thing had simmered down to a commercial proposition" and the latter replied that it had; that defendant further said that he was then "willing to take Mrs. McCarthy back"; that her attorney then asked if defendant would agree to make provision for her separate maintenance and that of the children as evidence of good faith, and that defendant replied that he could not grant the demand.

Near the end of the hearing, in response to questions asked by the chancellor, defendant stated that he was "ready now to receive back" complainant into his home; and complainant stated that she was now "unwilling to return to her husband" and would not return.

The defendant did not sustain the burden of proving the allegations contained in his answer as to complainant's "inordinate desire" to spend his money for her personal adornment and entertainment, and as to her money demands upon him in excess of his income, and as to her "mania" to spend money, and as to her removing without right from the family home, after the separation, any of his individual property or chattels. And it sufficiently appears that the complainant is without property or income, and cannot properly support herself according to her station in life.

McCormick, Kirkland, Patterson & Fleming, for plaintiff in error; Perry S. Patterson and Charles F. Rathbun, of counsel.

Montgomery, Hart & Smith, for defendant in error; Louis E. Hart and Irving Herriott, of counsel.

Mr. Justice Gridley delivered the opinion of the court.

In the case of *Ross v. Ross*, 69 Ill. 569, decided in 1873, our Supreme Court affirmed the decree of the circuit court, granting separate maintenance. Mr. Justice McAllister in delivering the opinion of the court says (pp. 570-2):

"The husband, by the common law, is bound to provide his wife with necessaries suitable to her situation and his condition in life. As proceeding from this general duty, the common law courts have held that if a husband abandons his wife, or they separate by consent, without any provision for her maintenance, or if he sends her away, he is liable for her necessaries, and he sends credit with her to that extent. * * * *Evans v. Fisher*, 5 Gilm. 569. * * * These rules were based upon just and humane principles, but from the circumstances of their practical application the relief they were intended to afford was frequently beset with difficulties, and sometimes denied altogether, because the persons who trusted her on her husband's account must do so at their peril, they being subject to the burden of showing a case where the law gave her the credit of her husband for necessaries suitable to her situation and his condition in life. * * * Now, it was the inadequacy of the common law remedy, and the refusal of courts of equity to take jurisdiction for the enforcement of the husband's duty to furnish support and maintenance for his wife, that induced the legislature to pass the act of 1867, providing that married women who, without their fault, are living separate and apart from their husbands may have their remedy in equity, in their own respective names, against their respective husbands, for a reasonable support and maintenance, to be allowed with reference to the condition of the parties in life and the circumstances of the respective cases. * * * The bill in this case was filed

under that statute by appellee, while living separate and apart from her husband, and the only question pre-- sented is, whether she was so living separate and apart from him under such circumstances as would clothe her with the right at common law to obtain support and maintenance upon his credit. To be so, it must be without her fault. If she left his house to live apart from him, either in consequence of improper treatment, or he assented to or acquiesced in her leaving, he is liable for her necessary support, and to that extent she had credit on his account in the community, as was laid down by this court in *Evans v. Fisher,* above cited."

The writer of the opinion then proceeds to analyze the testimony and it is further said (p. 573): "Appellant's conduct towards appellee had a direct tendency to drive her from the home, and it is a fair inference, from all the evidence, that he so intended it." Then, after setting forth the contents of a letter written by the husband to the wife about three months after she left him, it is said (p. 574): "This letter * * * shows appellant's acquiescence in her living apart from him, and brings the case fairly within the common-law rule of making him liable for her necessary support."

In 1877 the legislature re-enacted said separate maintenance statute of 1867, and in 1891 amended it, but the amendment did not materially change the substance of the 1867 statute. (3 Jones & Add. Stat. p. 3346, par. 6159.)

In the case of *Johnson v. Johnson,* 24 Ill. App. 80, 82, decided in 1887, the Appellate Court for this district, in affirming a decree for separate maintenance, said: "A woman's life may be made miserable and cohabitation with her husband made unbearable by other means than the inflicting by him of blows upon her person." The decree was also affirmed by our Supreme Court (*Johnson v. Johnson,* 125 Ill. 510) and that court, by Mr. Justice Shope, says (p. 515):

"The statute * * * gave the right to the wife to maintain her bill for separate maintenance, but re-

stricted the right to cases where the living separate and apart from the husband was without her fault. The 'fault' here meant and contemplated is a voluntary consenting to the separation, or such failure of duty or misconduct on her part as 'materially contributes to a disruption of the marital relation.' * * * No encouragement can be given to the living apart of husband and wife. The law and the good of society alike forbid it. But a wife who is not herself at fault is not bound to live and cohabit with her husband if his conduct is such as to directly endanger her life, person or health, nor where the husband pursues a persistent, unjustifiable and wrongful course of conduct toward her, which will necessarily and inevitably render her life miserable, and living as his wife unendurable. * * * If the husband voluntarily does that which compels his wife to leave him, or justifies her in so doing, the inference may be justly drawn that he intended to produce that result, * * *. And if he so intended, her leaving him would, in the case put, be desertion on his part, and not by the wife.''

After reviewing the evidence in the case the court further says (pp. 518-19):

''That appellee was not wholly blameless, at all times, in respect of the troubles with her husband, or as patient under provocation as some women would have been, is, we think, apparent, and may be conceded without materially affecting her cause. There were occasional sallies of passion and the use of harsh language, which, while it cannot be approved, would be no palliation, justification or excuse—if, indeed, anything could be—of the personal violence inflicted by the husband upon the wife, or for the persistent course of conduct toward and treatment of her, pursued by appellant, which would inevitably result, as he foresaw it must result, in estrangement and separation. The husband and wife must mutually bear with each other's tempers and dispositions. Mere ebullitions of temper, trivial delinquencies of conduct, and the like, cannot be made the grounds for disrupting the family, nor

a pretext for a course of conduct which necessarily produces that result. * * *

"It is urged that after the filing of the bill, appellant having requested appellee to return and live with him, she was bound to do so, and therefore the decree is erroneous. * * * Although appellant may have deserted appellee, or driven her away from him, it is undoubtedly true that the *locus penitentiæ* must be kept open for him; but if he offers to return, or to take her back, it must be in good faith and under circumstances giving reasonable assurance of amendment. On a former occasion she had, in consequence of his cruelty, left him and gone to her mother's. He went after her and promised her better treatment. * * * She accepted of his repentance as genuine, and, relying on his promise, returned, but there was no amendment in his conduct. On the occasion referred to by counsel there was no repentance, no offer to do better, no promise of kindness, no protestation of respect or confidence,—only, as we have seen, an expression of his wish that she return and live as they had lived, or in separate rooms, if she preferred, and an implied doubt of her purity. She was not bound to return and receive the same treatment at his hands, nor return to his domicile and there live apart from him. It is the actual marriage of the parties—their living together as husband and wife in lawful wedlock—that the law favors, and that each has the right to demand."

In *Modjeski v. Modjeski*, 209 Ill. App. 213, on appeal from a decree dismissing for want of equity the wife's bill for separate maintenance, this branch of this Appellate Court reversed the decree and remanded the cause with directions to hear evidence as to appellant's expenses, solicitor's fees, and a proper allowance for her support. In referring to the cases, among others, of *Wahle v. Wahle*, 71 Ill. 510; *Johnson v. Johnson*, 125 Ill. 510; and *Porter v. Porter*, 162 Ill. 398, it is said:

"From these cases we gather that a wife may be guilty of such fault as would prevent her from maintaining her suit: First, by conduct on her part which

would give the husband just reason for divorce; second, by voluntarily consenting to a separation; third, by desertion although the time has not elapsed which would give the husband cause for divorce on that ground.''

In accordance with said directions the chancellor heard further evidence and entered a decree granting separate maintenance and awarding the wife a certain sum per month and solicitor's fees and the case again came before this court and this decree was affirmed (*Modjeski v. Modjeski,* 215 Ill. App. 632, Abst.), and a petition for a writ of certiorari was denied by the Supreme Court.

It is a rule that the finding and decree of a chancellor in a separate maintenance suit, where he had the opportunity, as in the present case, of seeing the witnesses and hearing them testify, should not be disturbed on appeal, except where the evidence clearly preponderates against such finding and decree (*Porter v. Porter,* 162 Ill. 398; *Johnson v. Johnson,* 125 Ill. 510, 514). Yet, after a careful review of the entire evidence in the present case, and in the light of the decisions above mentioned, we have reached the conclusion that the complainant is entitled to a separate maintenance, and that the decree of the learned chancellor, dismissing her bill for want of equity, is clearly against the weight of the evidence and should be reversed.

While it is apparent, as said in the *Johnson* case, *supra,* that she was not wholly blameless, or as patient under provocation as some women would have been, still, in our opinion, she was not guilty of any of the faults mentioned in the *Modjeski* case, *supra,* which would prevent her from maintaining her bill. Her conduct was not such as would entitle her husband to a divorce. She did not voluntarily consent to the separation, nor did she desert him. On the night the parties finally separated, July 12, 1917, he practically drove her from the family home. He admits that, during the

stormy conference then had, he at one time "flashed his clinched fist" in her face, and said he would "break her back." On a previous occasion, the morning of February 19, 1917, he had threatened her life. He admits that he then twice flourished a revolver, though he says "he did not point the gun at her." These actions on his part were inexcusable and cruel and we think that, from these actions and from some other actions disclosed in the record, the inference may be justly drawn that he intended to bring about a separation. The record further discloses that for at least a year before the final separation the parties did not have any relations as husband and wife; that he was at least indiscreet in his attentions to other women; that, when gossip came to her that perhaps he was unfaithful to her and she demanded explanations, he treated her harshly, refused to make any explanations, saying that it was "none of your business"; that after she had discovered certain entries made by him in a note book and had caused certain investigations to be made at the suggestion of a priest from whom she sought advice, resulting in at least a partial confirmation of her suspicions, he repeatedly and angrily refused to make any explanations whatsoever. We think that she was justified in repeatedly insisting that he explain his conduct and said entries; and that in this connection he pursued such a persistent and unjustifiable course of conduct towards her as would necessarily render her life miserable and living with him as his wife unendurable. And the record further discloses that, after the final separation, he said and did things which tend to show that he acquiesced in her leaving. He testified that she and her sister had been "snooping around" the family home several times, and that after complainant had, without his knowledge or consent, taken away some household effects, he "changed the locks on the doors to make certain that no one would enter the house." He further testified that at

a conference with complainant's attorney, after the separation, he said he was "willing" to take her back, yet with this exception he had not said or done anything, subsequent to the separation, to "induce" her to return to him. Under the circumstances she was not bound to return. He made no promise of future kindness or better treatment. While some of the actions of complainant on August 12, 1917, were improper, it nevertheless appears that on that occasion he refused to let her enter the bedroom which she had formerly occupied.

For the reasons indicated the decree of the superior court is reversed and the cause is remanded with directions to hear evidence as to a proper amount to be allowed complainant for her separate maintenance, for solicitor's fees and costs, and for other proceedings not inconsistent with the views herein expressed.

*Reversed and remanded with directions.*

BARNES, P. J. and MATCHETT, J., concur.