Elizabeth Pearsons, Defendant in Error, v. Harry P. Pearsons, Plaintiff in Error.

Gen. No. 37,688.

Opinion filed November 5, 1935. Rehearing denied November 22, 1935.

Lloyd C. Whitman, of Chicago, for plaintiff in error.

Frank E. Cantwell, of Chicago, for defendant in error.

Mr. Presiding Justice Scanlan delivered the opinion of the court.

By this writ of error defendant seeks a reversal of a decree granting separate maintenance to plaintiff.

The case was tried by an able and experienced judge and no complaint is made that he erred in the admission or exclusion of evidence, or that he manifested, in any way, prejudice against defendant. The opinion he delivered after due consideration of all the evidence shows that he had a clear understanding of the issues involved and of the evidence bearing upon the same. He found that the equities were with plaintiff, that she had established the material allegations of her bill, that she was living separate and apart from her husband "without any fault or desire on her part so to do but solely by reason of the fact that the defendant abandoned her and refused to live with her or let her live with him." While defendant does not contend that the finding of the trial court is against the weight of the evidence on the main issues, we feel impelled to say that after a careful reading of the evidence we find ourselves in entire accord with the findings and decree of the trial court. In our opinion it would have been a miscarriage of justice had the trial court refused to grant plaintiff separate maintenance.

Confronted with a case wherein the equities on the main issue are with plaintiff, the able and ingenious counsel for defendant has raised a number of technical points in support of his claim that separate maintenance should not have been allowed. Plaintiff's bill charges that in May, 1930, defendant committed adultery with a certain woman and proof was introduced in support of the charge, but before the entry of the decree plaintiff was granted leave to strike from the bill the paragraph that charged adultery. While plaintiff was testifying, the following occurred: "Mr. Cantwell (attorney for plaintiff): Have you been willing that your husband return to you or make a home for

you, or have you been willing to go to his home? Mr. Whitman (attorney for defendant): *Objected to, it is incompetent.* The Court: Overruled. She may answer. A. I would be very pleased to go back to my husband if he could let other women alone. Mr. Cantwell: If he would give you that assurance, would you? A. Yes. Q. You would go back to him? A. Yes, I would.'' Defendant, although he objected to the questions as incompetent, now contends that because of these answers the case should end, unless we find that the alleged adultery was proven. We find no force in the contention. The issues in a suit for separate maintenance and a suit for divorce are not the same. The essential elements of a decree for separate maintenance are, 1st, residence of the parties; 2d, the wife's living separate and apart from her husband without fault on her part; 3d, that she is in need of the husband's support which he is able to give and fails so to do. It was not necessary to prove the alleged adultery, and under the facts disclosed by the evidence and the law bearing upon the same plaintiff was not bound to return to defendant unless he assured her that he would ''let other women alone.'' Such would be the rule even if defendant had asked plaintiff to return. (*McCarthy v. McCarthy,* 219 Ill. App. 369; *Cash v. Cash,* 201 Ill. App. 151; *Johnson v. Johnson,* 125 Ill. 510; *Porter v. Porter,* 162 Ill. 398, 400.) In the instant case, however, defendant had persistently refused to allow plaintiff to live with him in his home, and on one occasion, when plaintiff went to his home and told him that she wished to be maintained in his home and that she had a right to be there, he testified that he replied to her as follows: ''I told her very firmly that she had not (a right to be in his home) and that she knew it as well as I did, and that I would like to have her leave without any further ado, or further trouble. She persisted in staying, and the police officers took her away.'' Defendant, who had been mayor of Evanston

for many years, admitted that he sent for the police and had them eject plaintiff from his home and take her to the police station. Plaintiff testified that she was roughly handled by the police on that occasion. Upon cross-examination defendant stated: "I do not want my wife now." His attitude throughout was that he would not allow her to live in his home, would not live with her elsewhere, and on an occasion when the plaintiff went to his home and begged him to acknowledge the marriage and allow her to live with him, he not only refused to grant her request but treated her with scorn and contempt. Not only her evidence, but his evidence shows that she made repeated, sincere efforts to live with him. The home of defendant was also the home of his father. The trial judge was justified in finding that immediately after the marriage ceremony defendant asked plaintiff to keep the marriage a secret because of his aged father's severe illness and because his daughter and her little girl were coming to spend the summer with him at his home; that he told her to move into one of six houses, located in Evanston, that he owned, and promised her that he would announce the marriage later in the summer or in the fall, at which time she could move into his home; that thereafter, upon one pretext or another, he deferred the announcement and in March, 1929, plaintiff, over his angry objections, announced the marriage; that he refused to contribute anything toward her support and advertised in the public press that he would not be responsible for her debts. In support of defendant's present contention he cites *Hoffman v. Hoffman*, 316 Ill. 204, 212–4. There it appears that the wife voluntarily abandoned her husband without good cause and filed a bill against him charging that he was a man of ungovernable temper and had treated her with cruelty and abuse. There was a finding that her charges were not sustained and the bill was dismissed. She thereupon offered to return to her husband's home

and make amends for past occurrences. The trial court held that the evidence showed her offer to return was not made in good faith, and the Supreme Court sustained that finding and held that while it is the duty of a husband to receive back his wife upon her offer to return, even though the original separation was without his fault, the preponderance of the evidence must show that the offer was made in good faith. That case, in principle, is against defendant.

The bill alleges that plaintiff was lawfully married to defendant on June 16, 1928, at Ottawa, Illinois, "and from thence hitherto until on or about *to-wit*, the 20th day of August, 1929, your oratrix and the said defendant lived and cohabited as husband and wife." Defendant, assuming that the allegation, "lived and cohabited as husband and wife," the period of which living and cohabiting is laid under a *videlicet* (see *Collins v. Sanitary District*, 270 Ill. 108, 111), is a material one, contends: "The parties never 'lived and cohabited' as husband and wife, if, as we contend, living and cohabiting together as husband and wife means the living together of a man and woman in a common dwelling, ostensibly as husband and wife." In support of this contention counsel cites such cases as *Robinson v. Robinson*, 188 Ill. 371, 379, 380, and *McKenna v. McKenna*, 180 Ill. 577, 587, which involve alleged common law marriages; and also cites cases like *Cannon v. United States*, 116 U. S. 55, and *Commonwealth v. Lucas*, 158 Mass. 81, which involve criminal prosecutions for polygamy. Living together in a home is one of the methods of proving a common law marriage or a charge of polygamy. In the instant case the parties were legally married.

"The word cohabit is of large and flexible signification, having several meanings. The ideas which accompany the use of the word determine its import. The subject to which it is applied contracts or expands its meaning; so that in order to give it proper effect in

any given case regard must be had to the subject matter to which it relates, to the situation and conditions in respect to which it is used, and to the explanatory and qualifying language accompanying it.'' (11 C. J. 950.)

"The word is not one of a certain meaning." (*State v. Chandler*, 96 Ind. 591, 592.)

"The acquired meaning varies, necessarily, with the connection in which the word is used." (*State v. Freddy*, 117 La. 121, 124.)

Cohabitation does not necessarily mean living under the same roof. (See Bouvier's Law Dict. (3rd Rev.) Vol. 1, p. 519.) Defendant concedes that "the term is sometimes construed as implying sexual intercourse." Defendant's contention, if it be carried to its logical conclusion, and tested by the facts of the case, amounts to this: After he had legally married plaintiff he could give her a home and there repeatedly hold intercourse with her, but that if he by trickery or force prevented her from living in "his home" she could obtain no relief under the separate maintenance act. A mere statement of the position is a sufficient answer to it. Defendant testified that after the marriage he asked plaintiff "if it would be possible for her to come to Evanston to live and of course we would be nearer to each other." Upon his request plaintiff, the latter part of June or the first of July, 1928, moved from her old home, with her furniture, to a house in Evanston owned by defendant, which he told her would be a suitable home for her. He came there frequently, had his dinner there "every day or every other day," and the parties "spent a great deal of time together." He finally admitted that from the time of the marriage until about Christmas, 1928, they frequently held intercourse. This testimony was contrary to his original position. While defendant in one answer stated that he was never in love with plaintiff, upon cross-exami-

nation he admitted that she was a very charming woman, that they were very happy until the fall of 1928, and that his feelings changed because in the latter part of that year she was constantly accusing him of paying attention to other women. There is evidence, oral and documentary, that clearly shows that at the time of the marriage and for some time thereafter he was very fond of plaintiff. Plaintiff testified that sometime after the marriage defendant told her ''that he had been fooling me all summer; that he was interested in this other woman, there was no use of us going on, that he no longer cared for me.'' As stated by the trial court, in his opinion, for some reason best known to defendant his ardor and love cooled. The trial court was fully justified in refusing to believe the testimony of defendant to the effect that at the time of the marriage the parties had an agreement that they should always live separate lives and keep the marriage a secret, that an abortion was to be performed on plaintiff and that after the operation they were to ''arrange a separation or a divorce.'' The trial court was also justified in finding that defendant's testimony in reference to the alleged pregnancy and abortion was made out of whole cloth and was injected into the case to serve as an excuse for his unhusbandlike conduct toward plaintiff after the marriage. The concluding part of defendant's brief is so scandalous in its nature that had counsel for plaintiff, in apt time, called our attention to the same, the brief would have been stricken from the record. The reply brief is also subject to the same grave criticism. In order to explain documentary evidence tending to prove that defendant was in love with plaintiff before the marriage defendant argues that his feelings were ''the warm affection a man would have for his mistress,'' and that ''the fact that a man is passionately attached to his mistress is no proof that his intentions are honorable.'' Defend-

ant willingly tars himself in the hope that some of it may attach to plaintiff. His position seems to be that if he can convince the court that the parties held intercourse from time to time before the marriage, plaintiff should be denied separate maintenance, regardless of what transpired after the marriage.

After defendant had filed his brief in this court he entered a motion in which he set up that the decree entered was "void *in toto,* on the face of the record, for lack of jurisdiction in the trial court to enter the same," and he asked for leave to file an additional brief setting up the jurisdictional point and authorities in support of it. We granted the motion. In the additional brief, after stating the well known principle that in a separate maintenance case the court is without jurisdiction to decree it except where the proof shows that the wife is living separate and apart from her husband without her fault, counsel calls attention to the testimony of plaintiff, to which we have already specifically referred, to the effect that she would be pleased to go back to her husband if he would give an assurance that he would "let other women alone," and argues that because of that testimony plaintiff has failed to prove that she is living separate and apart from her husband without her fault, and that therefore the court was without jurisdiction to enter the decree in question. What we have heretofore said upon the subject matter of that testimony sufficiently answers the instant unmeritorious contention.

After the trial court had rendered his decision in the case defendant filed a motion "to reopen proofs as to defendant's financial worth, resources and income." The motion was allowed and an order was entered "reopening proofs as to defendant's financial worth, resources and income," and "the matters as to which proofs were opened" were referred to a master to take further testimony and report the same to the court with his conclusions. The master, after hearing evi-

dence, filed a report which contained the following findings:

"1. That the defendant, Harry P. Pearsons, is the owner of the following described premises:—

"(a) 1714 Chicago Avenue, Evanston, Illinois.
(b) 1718 Chicago Avenue, Evanston, Illinois.
(c) 115.04 acres of land in Cook County, Illinois.
(d) 393.19 acres of land in Polk County, Minnesota.
(e) 160 acres of land in Swift County, Minnesota.
(f) A beneficial interest in Trust No. 121 of which the City National Bank of Evanston is Trustee, covering any other premises, No. 2752 Garrison Street, Evanston, Illinois; upon which there is due the sum of $3922.00 to Harry P. Pearsons.

"2. I further find from the testimony of Harry P. Pearsons, that his receipts and expenditures from his business and property during the year, 1931, were as follows:

## "Receipts

| | |
|---|---|
| Net from sale of 1816 Chicago Avenue, Evanston, Ill. | $3,560.53 |
| Net from sale of 1718 Chicago Avenue, Evanston, Ill. | 1,524.22 |
| Rent from 1718 Chicago Avenue, Evanston, Ill. | 271.16 |
| Net from Minnesota farm | 193.06 |
| Gross from law practice | 399.35 |

Total Receipts......$5,948.32

## "Expenditures

| | |
|---|---|
| Cook County Farm, Operating Loss | $126.90 |
| Office Expense | 663.85 |

Total Expenditures......$790.75   $ 790.75

Net Receipts.......$5,147.57

"I further find that there is no testimony in the record to justify the charge of an operating loss of $299.40 on the Minnesota farm nor a loss of $364.40 on 1714 Chicago Avenue. I further find that the giving of a bond on the sale of 1816 Chicago Avenue, Evanston, Illinois, to indemnify the purchaser against the dower rights of the Complainant herein, is not a proper charge and should be disregarded.

"3. I further find from the testimony of Harry P. Pearsons that the total unpaid taxes for the years 1929 and 1930 on the premises owned by him as above set forth, aggregates the sum of $2,410.70.

"4. I further find that the present rental value of the premises, 1718 Chicago Avenue, Evanston, Illinois, is $1,200.00 per annum. That as a part of the consideration for said rental, the defendant pays the sum of $315.16 per annum to the Public Service Company for heating the said premises. That the general taxes thereon average the sum of $550.00 per year.

"5. I further find the encumbrances on the premises with the rates of interest payable thereon are as follows:—

(a) 1714 Chicago Avenue,
    Evanston, Illinois....$15,000.00 at 6% interest.
(b) 1718 Chicago Avenue,
    Evanston, Illinois....$12,500.00 at 6% interest.
(c) 160 acre farm in Swift
    County, Minnesota...$ 6,000.00 at 5% interest.

"6. I further find that all the premises owned by the defendant were conveyed by him in Trust to the Commercial Trust & Savings Bank of Evanston, Illinois, under Trust Number 70, by deed dated February 24th, 1928; which deed was recorded in the Recorder's Office of Cook County, on the 23rd day of June, 1928, subsequent to the marriage of the Complainant and Defendant; that the defendant was the sole beneficiary in said trust; that on August 4, 1931, the said premises were

conveyed to Katharine P. Hadden, a relative of the defendant, upon his written instruction to the said Commercial Trust and Savings Bank, and that on the 4th day of August, 1931, the said bank was in liquidation and disposing of all its Trust Estates.

"7. I further find that by deed dated February 24th, 1928, but recorded on the 17th day of August, 1928, subsequent to the marriage of the Complainant and Defendant, the said defendant conveyed a valuable piece of property to his daughter, Frances P. Rust, described as follows:— (Here follows the legal description.)

"8. I further find from the report of the Public Accountant for the defendant and from her testimony that the defendant is Trustee for a Trust Fund created on October 15, 1926, consisting of funds in Pearsons' Investment Company, farms, H. A. Pearson's pension, notes receivable, and mortgages; that said trust fund received the total sum of $123,311.99 and expended the sum of $123,324.57 from January 1, 1928 to May 31, 1932; that said receipts were obtained from sales of land, receipts from mortgages, notes, pensions, stocks, farm products, loans, etc.; that among said receipts, there was deposited to the personal account of the defendant, Harry P. Pearsons, from January 1, 1928 to May 31, 1932, the sum of $46,754.30; that in addition thereto Harry P. Pearsons deposited to his account the further sum of $20,308.25 income from interest, rentals, lawyers, fees, sales of stock, loans, legacies, etc. That among the sums deposited to his checking accounts were items of $3,266.90, 'in and out' business through his office. I further find that the defendant, Harry P. Pearsons, in addition to said sums deposited to his account, received the sums of $2,655.00 from January 1, 1928 to May 31, 1932 in cash by checks from the Trustee Account.

"I therefore find that the defendant, Harry P. Pearsons, received as deposits to his personal account and

from cash, from January 1, 1928 to and including May 31, 1932, the following sums:—

From Trust Fund payable by checks to him-
self .....................................$46,754.30
From Trust Fund payable by checks to cash   2,655.00
From interest, rentals, fees, sales, loans,
legacies, etc. ........................... 20,308.25

$69,717.55
Deduct 'in and out' items......... 3,266.90

Total.................$66,450.65

"I therefore find from the audit and testimony of Defendant's witnesses, that the defendant's combined income, including capital receipts, receipts from loans on real estate, sales of real estate, stock, legacies, earned income, etc., averaged for the period commencing January 1, 1928 and terminating May 31, 1932, the sum of $12,556.72 per year.

"8. I further find that although the defendant contends that the said Trust Fund is to be distributed one-seventh to himself and six-sevenths to his father, H. A. Pearsons, the defendant, as Trustee, has full power and authority to withdraw funds therefrom, has been utilizing the said fund as his own personal fund, and has deposited therein, from time to time, sums of money received by him from sales of premises admittedly owned by him.

"9. I further find that the defendant resides with his aged father, H. A. Pearsons, in one of the pieces of property owned by him at 1718 Chicago Avenue, Evanston, Illinois, and that all funds for the support of his father and himself are withdrawn from said trust fund; that out of said sum is paid all household expenses and salaries of nurses, at the present time of $45.00 per week; that in the years, 1928 and 1929, the defendant had a Japanese servant to whom he paid a

weekly salary of between $25.00 and $30.00 a week and entertained his guests lavishly in country clubs and in his home; and that from January 13, 1928 to and including November 18, 1931, he paid out the total sum of $1,346.90 for intoxicating liquors. I further find that the defendant is the owner of stock in the Commercial Trust & Savings Bank of Evanston, Illinois, was a director thereof until the date of its liquidation and that the value of said stock, if any, cannot be determined until said bank is completely liquidated. I further find that the defendant, Harry P. Pearsons, has acquired a high standard of living due to his splendid social position in Evanston, Illinois, and has been a member of Clubs of high standing in the said community.

"10. I further find that the Complainant, Elizabeth Pearsons, prior to her marrying the defendant, maintained a home for herself and three children by a former marriage, and did expend the average sum of $600.00 per month in supporting herself and children; that since her marriage with the defendant, she has engaged in speculation in the stock market, has lost all the funds inherited from her deceased husband and is now entirely dependent upon the defendant for support.

"11. I find that the defendant is the owner of considerable real estate, but can make no finding as to its value as no proof has been offered thereof before me. I am of the opinion however, that because of the lack of a present market for real estate and the condition of the real estate loan market at the present time, it would be difficult to secure mortgages thereon, and that the proceeds thereof are considerably lower than they would be in normal times.

"12. I further find that the sum of $300 is a fair, reasonable, usual and customary fee for solicitor for the complainant for the services rendered by him in

the hearings had before me, and recommend that said sum be paid the Complainant as Solicitor's fees for the services of her solicitor on this reference, and I further recommend that all of the costs of this reference, including said solicitor's fees, Master's fees and stenographer's fees be paid by the defendant.."
The trial court approved the report of the master and we are in accord with his action in that regard.

Defendant claims that "the allowance to complainant of $40.00 a week alimony was excessive and unfair." That amount is the same that defendant had been paying for a long time under a temporary order for alimony. From the report of the master and certain evidence heard by the trial court it is clear that the allowance is a moderate one. The argument that defendant is without means to pay anything for the support of his wife accords with the attitude of defendant in his original answer to the bill, wherein he swore "that he is unable to contribute anything to the support of the complainant." In connection with the instant contention certain findings in the master's report are illuminating. No suggestion is made as to what would be a reasonable amount to allow, and defendant takes the entirely unreasonable position that he is unable to contribute anything to the support of his wife.

Defendant contends that "the court improperly allowed solicitors' fees without differentiating between services to the legitimate ends of the suit and services touching matters of which the court had no jurisdiction." We find no merit in this contention and it appears to be an afterthought. Attorney Cantwell testified as to the services rendered and the various items that made up his claim. No objection was interposed during his testimony. He was not cross-examined nor was there any testimony introduced in rebuttal. From the attitude of counsel for defendant in the trial court it would seem that the trial court would have been justified in assuming that defendant was not contest-

ing the attorney's claim for services. The argument now made that "on the record it is impossible to differentiate between legitimate services and services for which no allowance was proper," is a general one and our attention is not called to any particular items of which defendant complains.

The decree ordered that defendant pay nine bills owed by complainant "for necessaries," one of which is, Lyon & Healy, $790.10. Defendant contends that this item is a balance on a $2,150 piano purchased by complainant on March 30, 1927, and under the rule that a husband is not liable for his wife's antenuptial debts, this item should be disallowed. It is a sufficient answer to this contention to say that the bill was admitted in evidence without objection and that the record fails to show that defendant at any time raised or suggested the point now made. Defendant contends that as to the nine bills the only remedy against the husband is by action of the person who furnished the goods or money against defendant and that the court erred in ordering defendant to pay plaintiff the amount of the nine bills. This contention is also an afterthought, as the record fails to disclose that defendant, in the trial court, made or suggested the point involved in the instant contention.

Defendant contends that "the court improperly decreed complainant dower rights in defendant's real estate." That part of the decree to which the instant contention applies is as follows:

"It is further ordered, adjudged and decreed by the Court that the complainant retain specifically her dower right in and to any and all of the defendant's real estate which the defendant owned at the time of the marriage—described as follows:" (Then appears the description of the various parcels of real estate to which it applies.)

In connection with the instant contention defendant calls attention to the antenuptial agreement entered

into between plaintiff and defendant at the time of the marriage, which provides, *inter alia,* that plaintiff is to receive from defendant $30,000 in cash or securities ''by last will and testament, or other instrument . . . in lieu and in bar of any and all right, or claim, of dower, in and to any and all of the lands, tenements, and hereditaments'' of defendant. In a suit for separate maintenance the court is without power to adjudicate the parties' property rights unrelated to the statutory object and purpose of the proceedings. (*Wolkau v. Wolkau,* 158 Ill. App. 341, 343–4; *McAdams v. McAdams,* 267 Ill. App. 124, 130, 132–3; *Spohr v. Kraus,* 197 Ill. App. 348, 351–2.) The divorce statute gives power to settle property rights where a divorce is allowed, but the separate maintenance statute grants no such power. The purpose of the separate maintenance act (1933) was to provide for married women ''who, without their fault, now live or hereafter may live separate and apart from their husbands, . . . a reasonable support and maintenance while they so live or have so lived separate and apart.'' The instant contention must be sustained.

Defendant contends that ''the court improperly, under all of the circumstances, made the decree a lien on defendant's real estate until he should give security for faithful performance.'' Defendant concedes that such an order would be proper where the facts warrant it, but he argues that he is virtually without income save from the real estate, ''most of it already heavily encumbered, which the court thereby hopelessly further entangled.'' It is the settled law of this State that in decreeing the wife a separate maintenance the court may, if the circumstances warrant it, make it a lien on defendant's real estate, and award execution for the collection of the instalments as they become due; that the right to enforce its decrees is inherent in courts of chancery. (*Johnson v. Johnson, supra,* 125 Ill. 510.) While it is true that a court should not un-

necessarily incumber a defendant's property and that no more of his lands should be tied up by a decree than is reasonably ample security for the payment required, we are satisfied that the trial court, in the instant proceeding, acted properly and wisely. Defendant argues that all of the real estate is so heavily incumbered that he is virtually without income from it. Under the evidence the court was justified in concluding that if he did not make the decree a lien on defendant's real estate the latter, to prevent plaintiff from enforcing her allowance, would dispose of his property. In this connection certain provisions of the antenuptial agreement must be borne in mind.

That part of the decree that adjudges that plaintiff retain her dower right in and to any and all of defendant's real estate which he owned at the time of the marriage, is reversed. The remainder of the decree is affirmed.

*Decree reversed in part and affirmed in part.*

SULLIVAN and FRIEND, JJ., concur.